1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

| | |
|---|---|
| TODD STEVEN PARR, | 1:10-cv-00579 AWI-MJS HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| MIKE MCDONALD, Warden, | |
| Respondent. | |

17    Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254. Respondent, Mike McDonald, is represented in this action by

19  William K. Kim, Esq., of the Office of the Attorney General for the State of California.

20  **I.    PROCEDURAL BACKGROUND**

21    Petitioner is currently in the custody of the California Department of Corrections

22  pursuant to a judgment of the Superior Court of California, County of Fresno, following his

23  conviction by jury trial of second degree murder, five counts of second degree murder, and

24  one count of hit and run. (CT[1], Vol. 2 at 382-83.) The trial court also found true various

25  enhancements and on May 11, 2007, sentenced Petitioner to serve thirty-nine (39) years and

26  eight months to life in state prison. (Id.)

27

28    [1]"CT" refers to the Clerk's Transcript on Appeal lodged by Respondent with his response.

U.S. District Court

E. D. California

On January 27, 2009, on direct appeal, the California Court of Appeal affirmed the judgment. (Lodged Doc. 1.) The California Supreme Court denied Petitioner's Petition for Review on April 29, 2009. (Lodged Doc. 2.)

Petitioner filed the instant federal habeas petition on March 19, 2010. (Pet., ECF No. 1.) Petitioner raises the following three claims for relief:

1.) Ineffective assistance of counsel for failing to challenge the prosecution's use of financial need as a potential motive;

2.) Ineffective assistance of counsel for failing to impeach the prosecution's witness based on his prior conviction for drug sales; and

3.) The trial court impermissibly rejected Petitioner's request for a special jury instruction regarding compensated informants.

(Pet.)

Respondent filed an answer to the petition on September 27, 2010, and Petitioner filed a traverse on June 8, 2011. (Answer & Traverse, ECF Nos. 17, 32.)

## II. **FACTUAL BACKGROUND**[2]

DeLaCruz was found shot to death in his apartment. Alfredo Castellon, DeLaCruz's friend and the person who discovered DeLaCruz, described him as a drug dealer who, up to about one month before his death, kept large amounts of marijuana and cash in his apartment. DeLaCruz generally bought and sold larger quantities of marijuana. In the past, DeLaCruz had been known to display large amounts of cash and marijuana at public places, apparently in an attempt to impress people. He stopped this behavior after he was mugged a few times. He stopped keeping marijuana in his apartment when a custody dispute arose over his child.

DeLaCruz was shot three times, one shotgun blast to the left shoulder, one gunshot to the right leg, and a second gunshot to the left foot. Death was caused by the shotgun blast that severed a major vein and artery, resulting in DeLaCruz bleeding to death. Technicians located one expended shotgun shell at the scene, as well as five casings from a .40-caliber handgun and six casings from a nine-millimeter handgun, most likely a Glock. They recovered a .40-caliber handgun locked in the open position, indicating that all rounds had been fired. They also found a quantity of marijuana and $3,600 in cash. The cash was discovered in a coat pocket.

During the investigation specimens of blood that were not from DeLaCruz

---

[2] The factual background is taken from the opinion of the state appellate court and is presumed correct. 28 U.S.C. § 2254(e)(1).

were found on the inside of the door to the apartment and on the walkway leading away from the apartment. DNA testing confirmed that [Petitioner] was the donor of this blood.

James Erickson, who was incarcerated while awaiting sentencing in a federal case for distribution of methamphetamine, was called as a witness for the prosecution. In exchange for his agreement to testify truthfully in this matter, federal prosecutors agreed to seek a 30 percent reduction from the maximum term of 20 years Erickson faced. Erickson also was provided with immunity for any testimony provided at trial.

Erickson testified that he had known [Petitioner] for the last five years and considered him a friend at the time of DeLaCruz's murder. They would see each other frequently and spoke on a daily basis about buying and selling crystal methamphetamine from each other. The two also would purchase items from one another.

On February 28, 2006, at approximately 12:50 a.m., [Petitioner] called Erickson and asked him if he had any money to buy something from him. Erickson assumed [Petitioner] was asking if he would buy some crystal methamphetamine from [Petitioner]. Erickson agreed to purchase the merchandise if it was any good. Erickson did not believe he saw [Petitioner] the night of February 27 or the early morning hours of February 28, but he was not certain. Erickson recalled seeing [Petitioner] during the day of February 27. In this meeting, Erickson did not observe any injuries to [Petitioner]'s face.

Later on the morning of the 28th, or perhaps on the following day, Erickson went to [Petitioner]'s house to visit [Petitioner]. Erickson spoke with [Petitioner]'s girlfriend, Gina Smith, who said [Petitioner] was sleeping and was not seeing anyone.

The next time Erickson saw [Petitioner], which was three to seven days after the 28th, Erickson observed an injury to [Petitioner]'s face. [Petitioner] looked like he had been stabbed. It appeared that pus was oozing from the injury. Erickson accompanied [Petitioner] to a pharmacy to buy some bandages for the injury. Erickson's heavy use of methamphetamine during this time affected his ability to recall certain events.

Detective Todd Fraizer interviewed Erickson on several occasions during the course of the DeLaCruz murder investigation. Erickson did not appear to be under the influence of any drug during those interviews.

During one of the interviews, Erickson said that on the night of February 27 [Petitioner] came to his house. [Petitioner] asked Erickson whether he had some money to buy some "stuff" if [Petitioner] could obtain it. Erickson said he was interested. [Petitioner] replied that he would be in touch if he obtained the "stuff." Erickson assumed [Petitioner] was referring to some sort of property or drugs. [Petitioner] did not have a visible injury to his face at that time.

The next day Erickson went to see [Petitioner], but [Petitioner]'s girlfriend, Smith, would not allow Erickson to see him. Erickson then spoke with [Petitioner] on the phone. [Petitioner] refused to allow Erickson into the residence. [Petitioner] said he was really "messed up." Four or five days later, [Petitioner] went to Erickson's residence. [Petitioner] asked Erickson to buy his vehicle. Erickson gave Parr $ 150.

Courtney Stinnett met [Petitioner] in December 2005. In the first week of March 2006 [Petitioner] visited Stinnett at her apartment. Parr stated that he had been in a motorcycle accident and had injured his face. Stinnett noticed a large injury to the right side of [Petitioner]'s face. Stinnett told [Petitioner] he needed to go to the hospital for treatment, but [Petitioner] said he could not because the police were looking for him. [Petitioner] asked Stinnett to repay some money she owed him for drugs, but Stinnett did not have it.

Stinnett walked [Petitioner] to the vehicle he was driving after Stinnett placed a bandage on his wound. [Petitioner] said the vehicle belonged to his ex-girlfriend. Stinnett observed [Petitioner] remove a handgun from underneath the front seat. When Stinnett started to leave the vehicle, [Petitioner] asked her if she knew anyone who could give him a ride to the mountains within the next hour because the police were looking for him and his girlfriend after the motorcycle accident. [Petitioner] also asked Stinnett if she knew anyone who would have sex with him because he would not be having any for a while. [Petitioner] also said that all his stuff was at his house, but he could not go back there.

Stinnett received a phone call from [Petitioner] about 45 minutes later. [Petitioner] asked her if she had found him a ride, and Stinnett told him she had not. [Petitioner] then told Stinnett how he had injured his face. [Petitioner] said he had gone to a Mexican drug connection's house to buy some drugs. After he left, [Petitioner] discovered the drugs were bad. [Petitioner] returned to the drug connection's house and returned the drugs. The drug connection gave [Petitioner] some new drugs. After he left for a second time, [Petitioner] discovered the new drugs also were bad. [Petitioner] returned to the drug connection's house and a fight ensued. The drug connection pulled a knife on [Petitioner]. [Petitioner] yelled for his girlfriend, Smith, to come into the house. Smith entered and first accidentally shot [Petitioner] in the face and then shot the drug connection. Stinnett initially could not recall [Petitioner] telling her where the drug connection lived but, after refreshing her memory, Stinnett recalled hearing that the incident occurred at an apartment near Herndon and Maple, but she was not sure who told her that information.

Stinnett first told the police about these events in October 2006. During the seven months between the murder and her contacting the police about the murder, Stinnett had been paid to provide information to the police on several occasions. [Petitioner] also had been Stinnett's drug connection.

Jason Nelson lived with [Petitioner] for about a year until Nelson moved out in October or November 2005. In October 2005, [Petitioner] was working at odd jobs, but he got laid off and there was no work to be found. In December 2005, [Petitioner] began selling methamphetamine to make money. [Petitioner] told Nelson that he lost an ounce of methamphetamine on the freeway and that was causing a financial problem for him. [Petitioner] was selling some of his construction tools to raise money. [Petitioner] also owed money for back rent.

Prior to DeLaCruz's murder, Nelson would see [Petitioner] maybe once or twice a week. After the shooting, Nelson had difficulty contacting [Petitioner] because [Petitioner] would not answer his phone. [Petitioner]'s girlfriend eventually answered the phone and told Nelson that [Petitioner] was sick. Within a week of the murder, Nelson finally spoke with [Petitioner] and arranged to meet him. [Petitioner] had a bandage on his face. [Petitioner] told Nelson he had

been in a shootout at DeLaCruz's house and that he needed some money. [Petitioner] said that during the shootout, his girlfriend shot him in the face. [Petitioner] admitted that he shot at DeLaCruz. [Petitioner] stated the incident "all went wrong." [Petitioner] also stated that he needed to leave town because the police were after him.

Jeremy Steinwand has a long history of criminal conduct, spending much of his life in prison or jails. In December 2005 he moved to Fresno and eventually obtained a job as a truck driver. He was suspended on or about January 31, 2006, for failing to disclose on his application a failed drug test. Steinwand obtained treatment for three weeks and then was reinstated at his job. Steinwand continued using heroin and methamphetamine while he was suspended.

During his suspension Steinwand lived with [Petitioner], a friend. Steinwand moved out when he returned to work. Steinwand was to pay half of the February rent when he moved in because [Petitioner] was behind on the rent. Steinwand never paid the rent. [Petitioner] was selling drugs during that time.

Shortly after Steinwand moved in, [Petitioner] stated that he knew someone that was selling marijuana and suggested he and Steinwand burglarize the residence. [Petitioner] believed they could steal about a pound of marijuana and $ 2,000 to $ 4,000. The two drove to an apartment complex near Maple and Herndon. [Petitioner] identified a vehicle in the parking lot, something similar to a Blazer or Bronco SUV, with a lift kit, stating that it belonged to the intended victim. Steinwand identified DeLaCruz's vehicle as similar to the one [Petitioner] pointed out. Because the vehicle was at the apartment, the two did not attempt to enter the apartment.

Within the next few days, Steinwand and [Petitioner] discussed going to the apartment with guns and forcing their way in. Within a couple of days, the two returned to the apartment. Steinwand had a .12-gauge sawed-off shotgun and [Petitioner] had a nine-millimeter handgun. [Petitioner] provided the guns. The handgun was the same one [Petitioner] carried most of the time. The SUV was at the apartment again, but [Petitioner] stated the victim had another vehicle, either a Mercedes or a Volvo. FN 3. The plan was to kick in the front door and enter the apartment. Steinwand told [Petitioner] that there were too many lights on in the complex, indicating other people were awake who could be witnesses, so he returned to their vehicle. The two then left the complex.

FOOTNOTE 3. Other witnesses testified that DeLaCruz owned both an SUV and a Mercedes Benz.

Over the next few days Steinwand and [Petitioner] developed a new plan. They decided to break into the apartment and bind the occupant with duct tape. [Petitioner] wanted to be the person who entered the room containing the safe. When Steinwand told [Petitioner] that he wanted to be there when the safe was opened, [Petitioner] disagreed. This led Steinwand to believe that [Petitioner] was not being entirely forthcoming. Steinwand began having reservations about the plan and eventually backed out. [Petitioner]'s girlfriend, Smith, was present during the discussions about the robbery. [Petitioner] became upset and indicated he needed money for rent. Steinwand said that was not his problem. His relationship with [Petitioner] deteriorated after that. Steinwand later learned that a homicide had occurred at the apartment complex where he and

1   [Petitioner] had gone. Employment records established that Steinwand was
    working in Washington at the time of the murder.

2
            [Petitioner] spoke with Fraizer while he ([Petitioner]) was being detained
3   to obtain a DNA sample. [Petitioner] denied ever being at DeLaCruz's
    apartment, or that his DNA would be found at the scene.

4
            [Petitioner] testified in his defense. He denied ever possessing a shotgun
5   before the shooting and denied casing out the apartment with Steinwand.

6           [Petitioner] admitted he was shot in the jaw by Smith, his girlfriend at the
    time. The shooting occurred in the doorway of DeLaCruz's apartment when he
7   and Smith went to the apartment to sell methamphetamine to DeLaCruz. When
    the two arrived at the apartment, they observed the front door had been kicked
8   in. [Petitioner] stepped inside and called for DeLaCruz. [Petitioner] was then
    shot twice. Smith attempted to return the gunfire and accidentally shot
9   [Petitioner] in the face. [Petitioner] did not know who fired the first shot.
    [Petitioner] ran away, but heard more gunfire while he was leaving.

10
            [Petitioner] denied being desperate for money in early 2006 because he
11  was generating income selling drugs. He denied ever talking with either Stinnett
    or Nelson about DeLaCruz's murder. He also denied talking with Steinwand
12  about DeLaCruz. He recalled speaking with Fraizer, but he could not recall what
    was said.

13
    (Lodged Doc. 1 at 2-8.)

14
III.    **DISCUSSION**

15
    A.      **Jurisdiction**

16
        Relief by way of a petition for writ of habeas corpus extends to a person in custody

17
pursuant to the judgment of a state court if the custody is in violation of the Constitution or

18
laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams

19
v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his

20
rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises

21
out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28

22
U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

23
    B.      **Legal Standard of Review**

24
        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

25
of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

26
enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484,

27
1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus,

28

U.S. District Court
E. D. California

1  it is governed by its provisions.

2        Under AEDPA, an application for a writ of habeas corpus by a person in custody under

3  a judgment of a state court may be granted only for violations of the Constitution or laws of the

4  United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal

5  habeas corpus relief is available for any claim decided on the merits in state court proceedings

6  if the state court's adjudication of the claim:

7
8        (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

9
10        (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11  28 U.S.C. § 2254(d).

12         1.   Contrary to or an Unreasonable Application of Federal Law

13        A state court decision is "contrary to" federal law if it "applies a rule that contradicts

14  governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

15  materially indistinguishable from" a Supreme Court case, yet reaches a different result."

16  Brown v. Payton, 544 U.S. 133,  141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA

17  does not require state and federal courts to wait for some nearly identical factual pattern

18  before a legal rule must be applied. . . . The statue recognizes . . . that even a general

19  standard may be applied in an unreasonable manner"  Panetti v. Quarterman, 551 U.S. 930,

20  953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law"

21  requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v.

22  Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application

23  of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions

24  must provide a governing legal principle (or principles) to the issue before the state court.

25  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an

26  "unreasonable application of" federal law only if it is "objectively unreasonable."  Id. at 75-76,

27  quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In

28  Harrington v. Richter, the Court further stresses that "an unreasonable application of federal

1   law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing

2   Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim

3   lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

4   correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S.

5   653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading

6   outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010).

7   "It is not an unreasonable application of clearly established Federal law for a state court to

8   decline to apply a specific legal rule that has not been squarely established by this Court."

9   Knowles v. Mirzayance, 556 U.S. ___, ___, 129 S. Ct. 1411, 1419 (2009), quoted by Richter,

10  131 S. Ct. at 786.

11                    2.        Review of State Decisions

12      "Where there has been one reasoned state judgment rejecting a federal claim, later

13  unexplained orders upholding that judgment or rejecting the claim rest on the same grounds."

14  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through"

15  presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006).

16  Determining whether a state court's decision resulted from an unreasonable legal or factual

17  conclusion,"does not require that there be an opinion from the state court explaining the state

18  court's reasoning." Richter, 131 S. Ct. at 784-85. "Where a state court's decision is

19  unaccompanied by an explanation, the habeas petitioner's burden still must be met by

20  showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now

21  holds and reconfirms that § 2254(d) does not require a state court to give reasons before its

22  decision can be deemed to have been 'adjudicated on the merits.'").

23      Richter instructs that whether the state court decision is reasoned and explained, or

24  merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is

25  the same: "Under § 2254(d), a habeas court must determine what arguments or theories

26  supported or, as here, could have supported, the state court's decision; then it must ask

27  whether it is possible fairminded jurists could disagree that those arguments or theories are

28  inconsistent with the holding in a prior decision of this Court." Id. at 786.  Thus, "even a strong

case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

>              3.      Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002). Musalin v. Lamarque, 555 F.3d at 834.

**IV.      REVIEW OF PETITION**

>    **A.      Claim One - Ineffective Assistance of Counsel - Financial Motive**

Petitioner's first claim was that trial counsel was ineffective in failing to object to

evidence and argument regarding Petitioner's financial need as motive. The claim was presented to the California Court of Appeal on direct review. (Lodged Doc. 1.) The appellate court denied the claim in a reasoned decision, stating:

> The prosecution theorized that [Petitioner]'s motive for the crime was money; DeLaCruz had money, and [Petitioner] needed it. Several witness testified that DeLaCruz wore expensive jewelry and liked to show off the jewelry and the money. Other witnesses testified that [Petitioner] was having financial difficulties at the end of 2005 and the beginning of 2006. [Petitioner] argues that it is improper to discuss a defendant's financial condition, and the error requires reversal of the judgment.

> The law in this area is well settled. "[A] defendant's poverty generally may not be admitted to prove a motive to commit a robbery or theft; reliance on such evidence is deemed unfair to the defendant, and its probative value is outweighed by the risk of prejudice. [Citation.] In some circumstances, however, evidence of a defendant's poverty is admissible for the limited purpose of refuting a claim that he did not commit the offense because he did not need the money, or to eliminate other possible explanations for sudden wealth after the occurrence of a theft offense. [Citations.]" (People v. Koontz (2002) 27 Cal.4th 1041, 1076.) Evidence of a defendant's poverty also is admissible if the defendant testifies that he did not commit the robbery because he did not need the money. (People v. Wilson (1992) 3 Cal.4th 926, 939.)

> We begin by noting that the issue is forfeited because [Petitioner] failed to object to the testimony at trial. (People v. Cornwell (2005) 37 Cal.4th 50, 96, overruled on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22.) To overcome this deficiency, [Petitioner] argues his counsel was ineffective for failing to object. A claim of ineffective assistance of counsel requires the defendant to establish (1) that trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that the defendant would have obtained a better outcome had counsel performed effectively. (People v. Dennis (1998) 17 Cal.4th 468, 540-541.) [Petitioner] cannot establish either prong of this claim.

> When assessing counsel's performance, we first look to determine whether counsel explained his reasoning in failing to object to the proffered evidence. If counsel explained his failure to object, we examine that reasoning to determine whether he or she was acting as a reasonable, diligent advocate. (People v. Cudjo (1993) 6 Cal.4th 585, 623.) If the record does not contain an explanation for the complained of behavior, we will reject the claim unless there could not be a rational explanation. (Ibid.)

> Evidence of [Petitioner]'s financial difficulties was introduced by the prosecution to establish a motive for the crime. This purpose is prohibited, and the evidence, upon a proper objection, should have been excluded. Trial counsel did not object, and there is no explanation in the record for this failure to object. We reject the claim of ineffective assistance of counsel, however, because there is a logical and rational explanation for permitting the prosecution to introduce the evidence.

> Two of the most damaging witnesses against [Petitioner] were Nelson and Steinwand. Success at trial was predicated upon establishing that these two

witnesses were not credible. Both witnesses testified that [Petitioner] was having financial difficulties in the time period in question, primarily because he was not able to pay the rent on the house he occupied. [Petitioner], however, was able to establish through his landlord that in early February, just weeks before the murder, he was able to make a $ 2,500 rent payment. Trial counsel may have decided that it would benefit [Petitioner] by allowing Nelson and Steinwand to testify that he was having financial difficulties and then impeach them with the landlord's testimony, thus suggesting that their entire testimony should not be believed. That this approach was unsuccessful does not mean that [Petitioner]'s counsel was ineffective.

Which brings us to the second prong of the claim -- a timely objection would not have resulted in a reasonable probability of a better outcome. The evidence against [Petitioner] was overwhelming. [Petitioner] admitted being at the scene, which the DNA evidence confirmed. [Petitioner]'s explanation of the events at the apartment was unbelievable because it failed to account for the blood found on the inside of the front door, which [Petitioner] denied touching. Also, his claim that he was shot as he entered the apartment would require the jury to believe that when [Petitioner] arrived, the perpetrator still was in the apartment. DeLaCruz could not have shot at [Petitioner] in the entry to the apartment because he had emptied his handgun while sitting in the bed. Moreover, the ballistic evidence did not support [Petitioner]'s testimony that his girlfriend shot into the apartment from the area of the front door.

Finally, the evidence was not damaging to [Petitioner] because he was able to prove through an independent witness, his landlord, that he had made a significant rent payment only weeks before the murder, thus suggesting he did not commit the murder because he was having financial difficulties. Since it is not reasonably probable that a better outcome would have been obtained had trial counsel objected to the financial testimony, we reject the claim of ineffective assistance of counsel.

(Lodged Doc. 1 at 9-11.)

Petitioner then filed a petition for review with the California Supreme Court which was summarily denied. (Lodged Doc. 2.) The California Supreme Court is presumed to have denied the claim for the same reasons stated in the court below. Ylst, 501 U.S. at 803.

1.     Ineffective Assistance of Counsel

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must consider two factors. Strickland, 466 U.S. 668; Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland,

466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; see also, Harrington, 131 S. Ct. 770 (2011).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Id. at 687.  The Court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1348; United States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. Id. at 692; United States v. Cronic, 466 U.S., at 659, and n.25 (1984).

As the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the standard for ineffective assistance of counsel in federal habeas is extremely difficult:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an

unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ___, ___, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S. Ct. 770, 785-86 (2011).

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 786. "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Id. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

Accordingly, even if Petitioner presents a strong case of ineffective assistance of counsel,  this Court may only grant relief if no fairminded jurist could agree on the correctness of the state court decision.

> 2.   Analysis

Petitioner's first claim of ineffective assistance of counsel is that counsel failed "to object to the prosecution's admission of evidence of Petitioner's financial need." (Traverse, ECF No. 32 at 3.) Petitioner asserts that defense counsel had no tactical reason for failing to object to the evidence of financial need. (Id.)

At trial, the prosecution presented evidence from witnesses Nelson and Steinwand that Petitioner was having financial difficulties and specifically having difficultly finding money to pay rent. However, in rebuttal, Petitioner presented testimony from his landlord that he made

a $2,500 rent payment just weeks before the murder. Based on this evidence, the state courts denied Petitioner's claim based on counsel's conduct not falling below an objective standard of reasonableness. The Court found that instead of objecting to the presentation of the financial evidence, that "[t]rial counsel may have decided that it would benefit [Petitioner] by allowing Nelson and Steinwand to testify that he was having financial difficulties and then impeach them with the landlord's testimony, thus suggesting that their entire testimony should not be believed." (Lodged Doc. 1 at 9-11.) While defense counsel could have applied other strategies at trial, he attempted in a reasonable manner to show that Petitioner did not have a financial motive based on the landlord's testimony. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; see also, Harrington, 131 S. Ct. 770 (2011). Petitioner has not presented sufficient evidence to overcome that presumption. Here, the state court's reasoning and application of the Strickland standard was reasonable, and "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. at 664 (2004).

Additionally, Petitioner has failed to show that he was prejudiced under Strickland due to the failure to object to testimony regarding his financial motive. The state court found the evidence against Petitioner overwhelming. Blood found from the scene was matched by way of DNA to Petitioner. Petitioner was observed by many witnesses to have an injury to his face, consistent with a gunshot wound, shortly after the time of the murder. During trial, a witness provided significant evidence that he and Petitioner conspired to burglarize the victim's apartment, but that the witness later backed out of the planed burglary. Further, Petitioner admitted that he was shot in the jaw by Smith at the victim's apartment doorway.

In light of the forensic and other evidence linking Petitioner to the scene of the crime, it is not likely that the failure to object to the evidence regarding financial difficulties would have reasonably changed the outcome of the trial. The state court of appeal's conclusion, that Petitioner was not prejudiced by evidence of Petitioner's financial difficulties, was reasonable. See 28 U.S.C. § 2254(d)(1). Accordingly, the state court's rejection of the claim was neither

1   contrary to nor an unreasonable application of <u>Strickland</u>. <u>See</u> <u>Harrington</u>, 131 S. Ct. at 785-

2   86. Petitioner's first claim of ineffective assistance of counsel is without merit.

3   **B.    Claim Two - Ineffective Assistance of Counsel - Failure to Impeach**

4        Petitioner second claim was that trial counsel was ineffective for not impeaching witness

5   Ronald Purcell with Purcell's prior felony conviction for selling drugs. (Pet. at 4, 17-19.)

6        1.    <u>State Court Decision</u>

7   The claims was presented to the California Court of Appeal on direct review. (Lodged Doc. 1.)

8   The appellate court denied the claim in a reasoned decision, stating:

>    [Petitioner] also contends that trial counsel was ineffective because he failed to elicit testimony that Ronald Purcell had suffered a prior drug conviction. We did not mention Purcell in our summary of the facts because we do not think his testimony was significant.

>    Purcell was called as a witness by the prosecution after an Evidence Code section 402 hearing was held. Before Purcell testified, the trial court ruled he could be impeached with a prior conviction for sale of an illegal substance.

>    At trial, Purcell admitted he knew [Petitioner] and thought he recalled seeing [Petitioner] with a wound on his face. Purcell could not recall (1) where the wound was on [Petitioner]'s face, (2) when he saw [Petitioner], (3) telling Fraizer that he had seen [Petitioner] at Danny Campbell's residence, (4) seeing [Petitioner] at Campbell's house, and (5) seeing [Petitioner] with a gun. Purcell admitted he was involved heavily in drugs at the time and, as a result, his memory was very poor. Purcell recalled speaking with Fraizer at a detoxification center and recalled Fraizer talking a lot about guns and trying to put that information "in [his] head." When Purcell was high on dope, he easily was manipulated. He was high when he spoke with Fraizer. Purcell did not recall whether [Petitioner] had a gun when Purcell saw him with a wound on his face. Purcell claimed that half of the information he provided to Fraizer was drug induced, and he did not want to testify. Purcell admitted on cross-examination that when he spoke with Fraizer he was just beginning his recovery from a $200 a day methamphetamine addiction.

>    We discussed in the preceding section the two prongs that [Petitioner] must prove before we will find the trial counsel was ineffective. As in the preceding section, he cannot meet either prong.

>    Purcell's testimony essentially was useless as he could not recall anything because his drug habit severely interfered with his memory. He admitted to having an extensive drug habit and to speaking with Fraizer just when he entered a rehabilitation program. Trial counsel logically could have concluded that impeaching Purcell with his prior drug conviction, which would not have surprised anyone in the courtroom, would not have accomplished anything.

>    Moreover, had trial counsel solicited the information, it is not reasonably likely [Petitioner] would have received a better result. The information sought

from Purcell, that he saw [Petitioner] with a handgun sometime after the murder, was not that significant to the prosecution's case, and Purcell's credibility already was severely damaged by his own admissions. The jury undoubtedly did not base its decision on Purcell's testimony, especially with the reliable evidence outlined in the preceding section. Accordingly, we reject this argument.

(Lodged Doc. No. 1 at 11-13.)

Petitioner then filed a petition for review with the California Supreme Court which was summarily denied. (Lodged Doc. 2.) The California Supreme Court is presumed to have denied the claim for the same reasons stated in the court below. Ylst, 501 U.S. at 803.

2.    Analysis

Petitioner's contends that trial counsel was ineffective for failing to impeach Purcell with evidence of his prior conviction for drug sales. (Traverse, ECF No. 32 at 3.) Respondent asserts that defense counsel was reasonable in not presenting the impeachment evidence as Purcell, by way of his own statements was not a reliable witness, and that Petitioner has not shown that he was prejudiced.

While on the stand, Purcell cast doubt on the reliability of the statements he made to Detective Fraizer. Purcell admitted that he was a heavy methamphetamine user, and was under the influence at the time he made the relevant statements to Detective Fraizer. Purcell said he could not recall much of the conversation with detective Fraizer and at times denied telling the detective that he saw Petitioner with a wound to the face or that Petitioner had a gun. Purcell suggested that the detective "planted" the idea that Petitioner had a gun, adding that was easily manipulated when he was under the influence of the drug, which he was when he spoke with the detective. (Lodged Doc. 12 [10 RT 2830-2836].) The state court's finding that Petitioner's counsel was reasonable in deciding that questioning Purcell regarding his drug sale conviction was unnecessary. Purcell, based on his own admission was a very weak witness, and his concessions that his statements were unreliable based on being on drugs had the same or stronger affect on his credibility as a drug sales conviction. The state court of appeal's finding that Petitioner's trial counsel had a tactical decision not to impeach Purcell with his prior drug sale conviction, was reasonable. 28 U.S.C. § 2254(d)(2).

Furthermore, Petitioner was not prejudiced by the failure to raise the drug sales conviction.

Purcell was not a strong witness, and as described above, significant physical evidence and testimony from other witnesses provided significant evidence that Petitioner was at the murder scene and involved in the incident. Nothing Purcell said would have changed the weight that the jury would place on the other evidence. The state court's rejection of the claim was neither contrary to nor an unreasonable application of Strickland. See Harrington, 131 S. Ct. at 785-86. Petitioner's second claim of ineffective assistance of counsel is without merit.

## C.      Claim Three: Instructional Error

Petitioner contends that the trial court erred in rejecting his request for a special instruction on compensated informants, specifically Stinnett. (Pet. at 6, 20-24.)

### 1.      State Court Decision

Petitioner raised this claim on direct appeal and the California Court of Appeal denied the claim in the last reasoned decision stating:

> [Petitioner] requested, and the trial court rejected, a special instruction based on section 1127a,[FN4] which instructs the jury to consider any benefit an in-custody informant receives as a result of testifying at trial. [Petitioner] modified the instruction[FN5] to refer to any informant and argued the instruction applied to Stinnett's testimony, since she was paid for providing information to the police about various drug transactions. Section 1127a was inapplicable because Stinnett did not meet the section's definition of an "'in-custody informant.'" (Id., subd. (a).) [Petitioner] argued the principles of the statute equally were applicable to an out-of-custody informant. He has not cited any case that supports his position, instead relying on the general rule that a trial court is required to instruct the jury on pertinent points of law. (§ 1093, subd. (f); People v. Wright (1988) 45 Cal.3d 1126, 1137.)
>
> [FN4] Section 1127a states: "(a) As used in this section, an 'in-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution. (b) In any criminal trial or proceeding in which an in-custody informant testifies as a witness, upon the request of a party, the court shall instruct the jury as follows: 'The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.' (c) When the prosecution calls an in-custody informant as a witness in any criminal trial, contemporaneous with the calling of that witness, the prosecution shall file with the court a written statement setting out any and all consideration promised to, or received by, the in-custody informant. The statement filed with the court shall not expand or limit the defendant's right to discover information that is otherwise provided by law. The statement shall be

1    provided to the defendant or the defendant's attorney prior to trial and the
     information contained in the statement shall be subject to rules of evidence. (d)
2    For the purposes of subdivision (c), 'consideration' means any plea bargain, bail
     consideration, reduction or modification of sentence, or any other leniency,
3    benefit, immunity, financial assistance, reward, or amelioration of current or
     future conditions of incarceration in return for, or in connection with, the
4    informant's testimony in the criminal proceeding in which the prosecutor intends
     to call him or her as a witness."

5

6    [FN5] [Petitioner] request the jury be instructed as follows: "The testimony of any
     informant should be viewed with caution and close scrutiny. In evaluating such
7    testimony, you should consider the extent to which it may have been influenced
     by the receipt of, or expectation of, any benefits from the party calling that
8    witness, such as Courtney Stinnett. This does not mean that you may arbitrarily
     disregard such testimony, but you should give it the weight to which you find it
     to be entitled in the light of all evidence in the case."

9

10       The trial court instructed the jury with Judicial Council of California
     Criminal Jury Instructions (2006-2007) CALCRIM No. 226, which, among other
11   items, informed the jury that it should consider various factors in judging the
     believability of a witness, including whether (1) the witness's testimony was
12   influenced by a factor, such as bias or a personal interest in how the case was
     decided, (2) the witness engaged in other conduct that reflected on his or her
13   believability, and (3) the witness was promised immunity or leniency in exchange
     for his or her testimony. While these topics do not state expressly that the jury
14   should consider whether a witness was compensated for providing information
     to the police, the jury was instructed that the list was not exclusive. The jury
15   rationally could infer from this instruction that it should consider whether Stinnett
     was compensated for her testimony. This instruction adequately informed the
16   jury on how to judge the credibility of the witnesses and, when combined with
     trial counsel's closing argument, ensured that the jury considered all relevant
17   factors in determining the credibility of Stinnett.[FN6] (People v. Garceau (1993)
     6 Cal.4th 140, 190-191, overruled on other grounds in People v. Yeoman (2003)
18   31 Cal.4th 93, 117-118; People v. Payton (1992) 3 Cal.4th 1050, 1059.) Even
     if we thought the trial court erred in rejecting the proposed instruction, we would
19   conclude the error was harmless. An error in refusing a requested instruction
     "requires reversal only if 'the court, "after an examination of the entire cause,
20   including the evidence," is of the opinion "opinion" that it is reasonably probable
     that a result more favorable to [defendant] would have been reached in the
21   absence of the error.'" (Wright, supra, 45 cal.3d at p. 1144.) As explained above,
     the evidence of [Petitioner]'s guilt was overwhelming, and the jury was instructed
22   on evaluating a witness's credibility. In addition, the trial counsel placed the
     issue directly before the jury when he referred to Stinnett as "a paid professional
23   informant[,] snitch and liar. She does what she wants to do, she says what she
     wants to say, as long as it is to her benefit." Instructing the jury that it could
24   consider that she was paid for information would not have resulted in a more
     favorable result for [Petitioner]."

25   [FN6] [Petitioner] suggests the trial court should have added a factor to
     CALCRIM No. 226 to specifically pertain to whether a witness was paid for his
26   or her testimony. There is no evidence in the record that such a request was
     made in the trial court, so we reject the argument. Had the request been made,
27   the trial court could have added a properly phrased factor.

28   (Lodged Doc. No. 1 at 13-15.)

2.   <u>Analysis</u>

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. <u>See</u> <u>id.</u> at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. <u>Id.</u> The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 169, 102 S. Ct. 1584, 71 L. Ed. 2d 816, (1982) (citing <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). <u>See</u> <u>Hanna v. Riveland</u>, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." <u>Id.</u>

Petitioner has failed to demonstrate the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. While a state court's error in interpreting or applying its own law may in some cases be so arbitrary or capricious as to rise to the level of a due process violation, or a violation of other constitutional rights (<u>see, e.g.</u>, <u>Richmond v. Lewis</u>, 506 U.S. 40, 50 (1992)), here it does not appear that the state courts' interpretation of its own laws was even unreasonable, let alone a due process violation. California Penal Code § 1127a(a), entitled "In-custody informant," clearly states that "[a]s used in this section, an 'in-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is

1  based upon statements made by the defendant while both the defendant and the informant

2  are held within a correctional institution." Penal Code § 1127a(a). Thus, under California law,

3  the trial court was not required to give the instruction because Stinnett was not an in-custody

4  informant.

5          Furthermore, the denial of the request to present a modified  instruction based on the

6  in-custody informant instruction did not deprive Petitioner of his right to present his defense

7  or render the trial fundamentally unfair. Petitioner's defense counsel examined Stinnett at trial;

8  argued at closing about the unreliability of Stinnett's testimony based on her being a paid

9  professional informant. As noted by the California Court of Appeal, the trial judge gave other

10  jury instructions, specifically CALCRIM No. 226, that the jury could consider in evaluating

11  Stinnett's testimony. Taken together, it must be found that the lack of the further, requested

12  instruction on Stinnett's testimony did not fundamentally deprive Petitioner of the right to

13  present his defense. See, e.g., United States v. Hernandez-Escarsega, 886 F.2d 1560, 1570

14  (9th Cir. 1989) ("So long as the instructions fairly and adequately cover the issues presented,

15  the judge's formulation of those instructions or choice of language is a matter of discretion.")

16  (citation and internal quotation marks omitted); United States v. Hurd, 642 F.2d 1179, 1181-82

17  (9th Cir. 1981) (so long as instructions given encompass defense theory, decision whether to

18  give special jury instructions lies within discretion of the judge).

19          For all of these reasons, Petitioner has not carried his burden to show that the omitted

20  instruction rendered the trial fundamentally unfair. Accordingly, habeas relief is not warranted

21  on this claim.

22  **V.      RECOMMENDATION**

23          Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be

24  DENIED with prejudice. It is further recommended that the Clerk of Court be directed to enter

25  judgment.

26          This Findings and Recommendation is submitted to the assigned District Judge,

27  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being

28  served with the Findings and Recommendation, any party may file written objections with the

1    Court and serve a copy on all parties.  Such a document should be captioned "Objections to

2    Magistrate Judge's Findings and Recommendation."  Any reply to the objections shall be

3    served and filed within fourteen (14) days after service of the objections.  The parties are

4    advised that failure to file objections within the specified time may waive the right to appeal the

5    District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

6

7

8    IT IS SO ORDERED.

9    Dated:     October 24, 2012               /s/ *Michael J. Seng*

10                                            UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28